UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:

MITCHELL J. COHEN,

                 Debtor.
-------------------------------------------------------x
TREUHOLD CAPITAL GROUP LLC,

               Plaintiff,

    - against -

MITCHELL J. COHEN, LEND AMERICA,
WELLS FARGO BANK, N.A., SAXON
MORTGAGE SERVICES, INC.,
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., as
nominee for LEND AMERICA, INC.,
AMERICA'S SERVICING COMPANY,
and RICHARD L. STERN,

              Defendants.
-------------------------------------------------------x

Chapter 7

Case No.: 08-70271-478

Adv. Pro. No.: 08-8058-478

## MEMORANDUM DECISION AND ORDER

*Appearances:*

Benowich Law, LLP
*Attorneys for Plaintiff*
By: Leonard Benowich, Esq.
1025 Westchester Avenue
White Plains, New York 10604

Meyer, Suozzi, English & Klien, P.C.
*Attorneys for Plaintiff*
By: Alan E, Marder, Esq.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530

Law Offices of Gabriel Del Virginia
*Attorneys for Defendant Mitchell J. Cohen*

By: Gabriel De Virginia, Esq.
641 Lexington Avenue
New York, New York 10022

DelBello Bonnellan Weingarten et al.
*Attorneys for Defendants Saxon Mortgage Services,*

*Inc., Wells Fargo Bank, N.A., America's Servicing*
*Company, and Mortgage Electronic Registration*
*Systems, Inc. as nominee for Lend America, Inc.*
By: Frank J. Haupel, Esq.
One North Lexington Avenue
White Plains, New York 10601

Before the Court is the Plaintiff's motion for summary judgment and the Defendants'

joint motion for summary judgment concerning whether the Plaintiff can void the transfer of

certain real properties by the Debtor to himself.  The Court has jurisdiction pursuant to 28 U.S.C.

§ 1334(a) and (b).  This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K) and

(O) and 11 U.S.C. §§ 506 and 541.  The following constitutes the Court's finding of fact and

conclusions of law as mandated by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").


FACTS

Alan Sarter ("Sarter") is the sole member of Plaintiff, Treuhold Capital Group, LLC.  The

Debtor Defendant and his former partner, Steve Wissak ("Wissak"), were the only members of

Metropolitan Housing LLC ("Metropolitan"), a successor-in-interest to City Development, LLC

("City Development") and other entities through which the Debtor operated a business of

locating potential real estate for purchase, improving such real estate, and finding purchasers for

such real estate.

From approximately 2002 to 2006, Plaintiff and Debtor, acting first through City

Development and then Metropolitan, had a business arrangement whereby Metropolitan would

locate 1 to 4-family properties for investment and enter into the contract to purchase those

properties.  Metropolitan would then approach the Plaintiff to see if it would be willing to

purchase the properties under contract and hold title to the properties.  Plaintiff had veto power

over which properties it would purchase.  Metropolitan would make any necessary

improvements or repairs to the properties purchased, attempt to secure a buyer for each of the

improved properties, and assist that buyer in obtaining financing.  The Plaintiff acquired the

properties free and clear of any mortgage so title could be conveyed to the subsequent purchasers without the Plaintiff having to satisfy a mortgage. In order to purchase the real properties, Plaintiff used some of its own funds and obtained asset-based loans from Medallion Business Credit LLC ("Medallion"). Medallion required Plaintiff (1) to furnish a copy of the deed to the properties in the Plaintiff's name before Medallion would fund its loans and (2) to pledge the properties to Medallion upon closing. Upon the closing of the sale of real property, Plaintiff was entitled to a return of the funds expended in acquiring the property, plus interest and the cost of obtaining insurance for the property, while Metropolitan was entitled to recover its cost of improving the property. Any proceeds in excess thereof, the profit, would be shared equally between Metropolitan and Plaintiff. There is no evidence of any agreement or discussion between the Plaintiff and the Debtor or Metropolitan to share any losses arising from a sale of property. This business arrangement is not spelled out in any written agreement.

More than 100 parcels of real property were purchased and sold under this business arrangement. Other than the closing of the first real property and one or two other closings under this arrangement, Sarter rarely attended any of the closings because the closings were often held after business hours and were time-consuming.

Plaintiff allowed the Debtor to execute the closing documents on the Plaintiff's behalf by signing "Mitchell Cohen" as authorized signatory for Alvin Sarter. However, neither the Debtor nor Metropolitan had a written power of attorney to act on the Plaintiff's behalf at these closings. The Debtor sometimes got sloppy and signed documents holding himself out to be a member of the Plaintiff or he would sign Sarter's name. Sarter kept a record of all the documents received from the Debtor relating to the purchase and sale of the properties. Sarter checked the

3

documents to ensure that the sale price and profit margin were approximately the amounts agreed upon with the Debtor but he did not concern himself with how the documents were executed as long as he received a return of his investment and the anticipated profit margin. The Debtor usually had the Plaintiff's share of the sale proceeds disbursed or deposited into Plaintiff's bank account within a day of the closing and the Plaintiff would receive information from the Debtor as to which property the proceeds related to and the amount that would be forthcoming. Plaintiff required the Debtor to provide it with a closing statement so that it could forward the statement to Medallion as evidence that a parcel of real property was sold.

Debtor made several transfers of property without Plaintiff's knowledge allegedly in order to raise capital in part to cover post-closing expenses incurred by Metropolitan in repairing the properties. Two of these transfers are the subject of this adversary proceeding: the transfers of 39 Coursen Place, Staten Island, New York (the "Coursen Place Property") and 22-25 Brookhaven Avenue, in Queens County, New York (the "Brookhaven Avenue Property", together with the Coursen Place Property, the "Properties").

Plaintiff had acquired the Brookhaven Avenue Property on October 11, 2006 for $405,000 plus customary closing costs. Approximately one month later, the Debtor executed a contract of sale dated November 7, 2006 on behalf of the Plaintiff to sell the property to himself for $550,000 and scheduled a closing two days later and executed a deed conveying title to the property from Plaintiff to himself for $10. The Debtor's sister, Ceil Calisto, who was a public notary, acknowledged that Sarter had personally appeared before her and executed the deed even though Sarter was not present at the closing. The Debtor admitted that he had signed Sarter's signature on the transfer documents without Sarter's knowledge of the transaction. In

4

connection with the transfer, the Debtor obtained a  $341,250 first mortgage and a $131,250 second mortgage from Lend America, and gave Lend America a security interest in the property. In addition, the Debtor forged Sarter's signature on (1) a letter to Lend America falsely acknowledging that Metropolitan had done $30,000 of work on the Brookhaven Avenue Property and (2) a statement to Lend America falsely indicating that Sarter was holding $1,000 from the Debtor with respect to the Debtor's purported purchase of the property.  These were all fraudulent acts perpetrated by the Debtor.  The first and second mortgages were assigned to Wells Fargo Bank, N.A. ("Wells Fargo") and Saxon Mortgages, Inc. ("Saxon"), respectively on November 17, 2006.  Currently, Wells Fargo holds a first mortgage lien in the amount of $337,500 and Saxon holds a second mortgage lien in the amount of $67,500.

Plaintiff acquired the Coursen Place Property on August 25, 2006 for $265,000 plus customary closing costs.  Without Plaintiff's consent, the Debtor executed a contract of sale dated November 14, 2006 to sell the Coursen Place Property to himself for $450,000 by signing Sarter's name and  executing a deed three days later purportedly conveying title to the Coursen Place Property from Plaintiff to Cohen for $10 without Sarter's knowledge of the transaction. Calisto again acknowledged on the deed that Sarter had personally appeared before her and executed the deed even though Sarter was not present at the closing and the Debtor was the one that signed Sarter's name.  The Debtor borrowed $405,000 from Lend America of which $337,500 consisted of a first mortgage and $67,500 consisted of a second mortgage, which were secured by the Coursen Place Property.  In connection with the financing, the Debtor forged Sarter's name to a statement dated November 15, 2006 that was submitted to Lend America, falsely representing that $61,000 of work had been done to the Coursen Place Property by

5

Metropolitan.  These were all fraudulent acts perpetrated by the Debtor.  The first and second mortgages were assigned to Wells Fargo and Saxon, respectively, on November 17, 2006.

Plaintiff did not receive any of the proceeds of the loans extended by Lend America in connection with the transfer of the Properties.  Although Debtor produced a copy of the face of a check made out to the Plaintiff by the Debtor's mortgage disbursement agent, Kenneth Golden, Esq., in the amount of $156,000 with respect to the Coursen Place Property, Plaintiff asserted that it never received such check and no evidence has been submitted that indicates that the check was ever negotiated.  The Defendants also produce check number 225385, dated November 9, 2006 in the amount of $294,000 made out to the Plaintiff from Golden's mortgage disbursement account purportedly from the loan proceeds arising from the transfer of the Brookhaven Avenue Property to the Debtor.  The check was deposited into Plaintiff's bank account on November 13, 2006.  Plaintiff has asserted that it received the $294,000 check in connection with the sale of another parcel of property, 165-11 108th Avenue of which Plaintiff had prior knowledge.  On November 13, 2006, check number 225385 was deposited along with check number 2027 dated November 13, 2006 from Metropolitan in the amount of $58,465.50.  Both of these checks total $352,265.50 which was the Plaintiff's cost basis in the 165-11 108th Avenue property.  Defendants have not denied the Plaintiff's assertions that the $294,000 check related to a property other than the Brookhaven Avenue Property.

In December 2006, Sarter discovered that title to several of the Plaintiff's properties were transferred to the Debtor without his knowledge.  When Sarter confronted Debtor with his discovery, Debtor admitted Metropolitan owed the Plaintiff money arising from the transfer of various properties to himself and other third parties.

6

On January 12, 2007, the Debtor and Wissak, individually and as members of Metropolitan, entered into a written agreement (the "January 2007 Agreement") acknowledging that they owed Plaintiff $3,104,086, inclusive of all sums due for principal, interest and in respect of Plaintiff's profit participation (the "Indebtedness"). If the Debtor and Wissak were to satisfy the Indebtedness by February 15, 2007, then the Plaintiff would forbear from taking any steps to collect the Indebtedness and mutual releases would be exchanged. The Debtor and Wissak made one payment of $1 million under the January 2007 Agreement but did not make the second payment of $2,104,086 by the February due date.

The Debtor and Wissak requested additional time to make the payment. At the Plaintiff's insistence, the parties entered into a Settlement and Forbearance Agreement in April 2007 (the "April 2007 Agreement") whereby the Debtor, Wissak and Metropolitan (the "Obligors") acknowledged that they were, jointly and severally, indebted to the Plaintiff in the amount of $1,935,986.02 as of February 15, 2007 for principal it had invested plus interest and the Plaintiff's profit participation. The payments were subject to interest at 12% per annum and a default rate of interest at 24%. In addition, Wissak was required to deliver a mortgage on his property in Rye, New York (the "Wissak Property") in the amount of $857,000 plus 12% interest in favor of the Plaintiff (the "Wissak Mortgage") which mortgage would be subordinated to a $2,170,000 existing first mortgage but would have seniority over a $900,000 mortgage given by Wissak to one of his relatives. In addition, Wissak and his wife executed a deed conveying the Wissak Property to Sarter to be held in escrow with all the transfer documents needed to record the deed (the "Wissak Deed") should Wissak default. If the Obligors default, the Plaintiff's agreement to forbear from taking any action would terminate and the Plaintiff would be free to

7

foreclose on the Wissak Mortgage, record the Wissak Deed and/or commence any and all litigation it deemed appropriate against each of the Obligors and others.

In addition, the Obligors agreed to indemnify the Plaintiff for any claims or causes of action that may be asserted against the Plaintiff arising from the business, acts or omissions of Metropolitan or any of the transactions engaged in by the Obligors relating to any of the Plaintiff's properties.  Upon the due, timely and complete performance by each of the Obligors, the Plaintiff would deliver a general release to each of the Obligors.  All prior understandings and agreements between the parties whether oral or written (including, but not limited to the January 2007 Agreement) were superseded by the April 2007 Agreement, which fully and completely expresses the agreement between the parties.  Attached to the April 2007 Agreement, *inter alia*, is an accounting of 9 parcels of property and how the parties arrived at the $1,935,986.02 figure that was still owed.

When the Debtor left Metropolitan in February or March of 2007, he left all his records with Metropolitan.  Metropolitan is defunct and the Debtor does not know what happened to the records.

The Debtor and Wissak paid approximately $976,175 of the $1,935,986.02 owed under the April 2007 Agreement before defaulting.  On October 25, 2007, Plaintiff commenced an action against Wissak and Metropolitan in the Supreme Court of the State of New York (the "Wissak Action") and obtained a Judgment in the amount of $761,522.  The judgment was docketed against Wissak and Metropolitan.  It does not appear that the Plaintiff has recorded the Wissak Deed.

The Debtor filed for chapter 7 relief on January 21, 2008.  The Plaintiff commenced this

adversary proceeding against the Debtor and the mortgagees of the Properties on March 21, 2008.  The Plaintiff filed a motion for summary judgment on February 17, 2009 ("Plaintiff's Summary Judgment Motion") seeking to vacate the deeds and mortgages on the Properties and have title be restored to it.  Plaintiff argues that the Debtor had no written authority to sign Sarter's name on the conveyance documents in order to sell the Properties' to himself without giving Plaintiff any consideration for the Properties.  Any oral grant of authority to do so is unenforceable under New York's Statute of Frauds.  In addition, Plaintiff argued that the April 2007 Agreement constitutes an executory accord under which the Plaintiff would be free to commence any and all litigation against each and any defaulting party should the Obligors default.

The Defendants filed their joint motion for summary judgment on February 18, 2009 (the "Defendants' Motion for Summary Judgment") seeking to have the adversary proceeding dismissed.  The Defendants argue that 1) the parties were engaged in a joint venture and the Plaintiff is deemed to hold title to the properties as trustee for the benefit of his or her coventurers; 2) the alleged joint venture arrangement between the parties need not be in writing as required under the Statute of Frauds because a) the arrangement is capable of being performed within one year, or b) the parties performed their obligations under the arrangement; 3) the Debtor had a general authority to execute documents in furtherance of the arrangement to sell the properties; and 4) even if the Debtor committed fraud, the mortgagees are bona fide lenders for value and did not have notice of the alleged fraud perpetrated by the Debtor.

Alternatively, the Defendants argue that if the Debtor was not authorized to transfer the Properties, the April 2007 Agreement constitutes a novation and the Plaintiff's recovery is

9

limited to monetary damages. In addition, the Defendants asserted various affirmative defenses arguing that the Plaintiff is barred from recovering on its claims in this Court because: 1) the Plaintiff ratified the sale of the Properties when it entered the April 2007 Agreement and agreed to accept monetary compensation in exchange for waiving its right to challenge the transfers; 2) res judicata applies when the Plaintiff had an opportunity to include the causes of action raised in the Wissak Action but elected not to do so and such claims byPlaintiff may have merged with the state court judgment it obtained; 3) the Plaintiff elected to pursue the Wissak Action to judgment and cannot maintain its claims in this proceeding; 4) the Plaintiff had unclean hands by permitting the Debtor and Metropolitan to execute the disputed deeds without having a formal written agreement in place; 5) the Plaintiff's failure to challenge the bona fides of the prior conveyances of property over a 5-year period constitutes laches; and 6) the Plaintiff is equitably estopped from challenging the transfers when the mortgagees extended $877,500 in loans to the Debtor without any knowledge of the Debtor's inability to execute the disputed deeds and would suffer a prejudicial change in position.

While the Debtor also disputes the interest payments Plaintiff was entitled to with respect to its financial outlay for each property, the issue of the appropriate amount of interest agreed upon by the Plaintiff and Metropolitan concerns the amount of the Plaintiff's proof of claim and is separate from, and has no bearing on, this adversary proceeding by the Plaintiff seeking to avoid the transfer of the Properties and the mortgage liens.

The Court conducted a hearing on the two summary judgment motions on March 17, 2009 and the parties made post-hearing submissions of any additional evidentiary support they may have for their arguments for the Court's consideration.

10

<u>DISCUSSION</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7056, the Court may award summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When no genuine triable issues of material fact exist, the moving party is entitled to judgment as a matter of law and summary judgment should be granted. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). The mere production of some evidence in support of the opposing party's position will not justify denial of a summary judgment motion, unless the court finds that there is evidence upon which a jury can properly proceed to find a verdict for the party opposing the motion. *American v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). A court must always "resolve ambiguities and draw reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 11. However, the opposing party may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.,* 804 F.2d at 12.

1.    Was there a joint venture?

The Defendants argue that Metropolitan had a beneficial interest in the Properties

because it was engaged in a joint venture with the Plaintiff; therefore, the Debtor could subject the Properties to a lien as a co-owner and the Properties cannot be declared free and clear of any equitable and actual liens of the Debtor, Metropolitan or the mortgagees.

The party asserting the existence of a joint venture has the burden of proof. *De Vito v. Pokoik*, 150 A.D.2d 331, 540 N.Y.S.2d 858 (N.Y. App. Div. 1989). Under New York law, for there to be a joint venture: 1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; 2) their agreement must evidence their intent to be joint venturers; 3) each must make a contribution of property, financing, skill, knowledge, or effort; 4) each must have some degree of joint control over the venture; and 5) there must be a provision for the sharing of both profits and losses. *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67-68 (2d Cir. 2003) citing *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990) (Emphasis added). 'The ultimate inquiry in determining whether a joint venture exists is whether "the parties have so joined their property, interest, skills and risks that for the purposes of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit."' *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 445 (S.D.N.Y. 2006) citing *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1201 (S.D.N.Y. 1996). Indeed, joint venturers like co-partners "owe to one another, while the enterprise continues, the duty of the finest loyalty." *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928); *The DIRECTV Group, Inc. v. Darlene Investments, LLC*, No. 05 Civ. 5819, 2006 WL 2773024 (S.D.N.Y. Sept. 27, 2006).

However, '[t]he absence of any one element "is fatal to the establishment of a joint

12

venture.'" *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004).

"Indispensable to the creation of a joint venture is a sharing in the profits and losses of the

business." *Williams v. Forbes*, 175 A.D.2d 125, 126, 571 N.Y.S.2d 818 (N.Y. App. Div. 1991).

"An individual who has no propriety interest in a business except to share the profits as

compensation for services is not a joint venturer." *De Vito v. Pokoik*, 150 A.D.2d at 331, 540

N.Y.S.2d at 858.  Courts have declined to find a joint venture where there was no agreement for

the sharing of losses in addition to the profits.  *Id.;* See also *Sea Carriers Corp. v. Empire

Programs Inc.*, No. 04 Civ. 7395, 2008 WL 2557422, *13 (S.D.N.Y. June 26, 2008); *Kidz Cloz,

Inc.,* 320 F. Supp. 2d at 175 (finding that the parties did not have an agreement to share losses

when they had never even discussed losses); *Kaufman v. Torkan*, 51 A.D.3d 977, 979, 859

N.Y.S.2d 253 (N.Y. App. Div. 2008); *Tilden of New Jersey, Inc. v. Regency Leasing Systems,

Inc.*, 230 A.D.2d 784, 786, 646 N.Y.S.2d 700 (N.Y. App. Div. 1996).

   In the case before the Court, the absence of a written agreement will not prevent a finding

of a joint venture if all the elements are satisfied.  The parties agreed that the Plaintiff and

Metropolitan would share in the profits arising from a sale of real property equally after the

Plaintiff recovers its investment in the property along with interest and costs of insurance, and

Metropolitan recovers its expenses incurred in improving and managing the property.  Thus,

there was an agreement to share profits.  While the Defendants argue the 50-50 nature of the

arrangement demonstrates the existence of an agreement to share losses, there is no testimony or

evidence of any discussion regarding the sharing of losses much less an agreement to do so

should a property be sold for less than the Plaintiff's cost basis or less than the aggregate amount

expended by Metropolitan in improving and maintaining the property and Plaintiff's cost basis.

13

In the latter situation, Plaintiff would not have suffered any losses while Metropolitan would not

be fully compensated for its costs.  There is no evidence that Plaintiff agreed to compensate

Metropolitan for unanticipated post-closing expenses incurred for matters such as additional

repairs or that Metropolitan could deduct such expenses from the Plaintiff's share of sale

proceeds with respect to the sale of that property or another property.  As a finding of an

agreement to share losses is indispensable to a joint venture, the Court finds that a joint venture

did not exist between the Plaintiff and Metropolitan.  Accordingly, the Defendants' claim that

Metropolitan was a beneficial owner of the Properties as a result of an alleged joint venture must

fail and the Defendants are not entitled to summary judgment on this issue.

2.      Was the Debtor and/or Metropolitan an agent of the Plaintiff for purposes of signing
        conveyance documents?

        While a contract to go into the business of buying and selling real estate as partner or

joint venturers does not come within New York's Statute of Frauds if such business is for less

than a one year period.  *Ebker v. Tan Jay Int'l, Ltd.*, 739 F.2d 812, 827 (2d Cir. 1984), the

Statute of Frauds would be applicable to any agreement to transfer of land from one joint

venturer to another.  *Backus Plywood Corp. v. Commercial Decal, Inc.*, 317 F.2d 339, 342 (2d

Cir. 1963); *Najjar v. National Kinney Corp.*, 96 A.D.2d 836 (N.Y. App. Div. 1983).  Under N.Y.

General Obligations Law § 5-703, any power to sign on behalf of a grantor of real property

needs to be in writing.  Although the Court has found that the Plaintiff and Metropolitan were

not engaged in a joint venture, to the extent the business arrangement provided for the transfer of

real property from Plaintiff to Metropolitan or the Debtor, then such written authorization for the

Debtor to sign Sarter's name would be required.  In this case, there is no evidence that the

Debtor or Metropolitan had a power of attorney or any written authorization to sign transfer documents on behalf of the Plaintiff.  While the Debtor alleges that Sarter provided proof to the title companies that the Debtor was an authorized member of the Plaintiff, no evidence of such authority has been submitted to the Court.

Despite the absence of any written authorization, the Plaintiff may be bound by Debtor's transfer of the Properties if the Debtor had either actual authority or apparent authority to transfer the Properties to himself without notice to the Plaintiff.  "[A] principal, even if innocent, is liable for acts of fraud that are within the scope of an agent's actual or apparent authority." *Chubb & Son Inc. v. Consoli*, 283 A.D.2d 297, 298, 726 N.Y.S.2d 398, 400 (N.Y. App. Div. 2001).

Under general agency principles, an agent has the actual authority to act or conduct a transaction on account of the principal which he is privileged to do because of the principal's manifestations to him.  "Such authority may be expressed or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Minskoff v. American Express Travel Related Serv. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996).  'The general rule followed in New York is that "an agent employed to do an act is deemed authorized to do it in the manner in which the business intrusted to him is usually done."' *Masuda v. Kawasaki Dockyard Co., Ltd.*, 328 F.2d 662, 665 (2d Cir. 1964).  However, such authority is not unlimited. *Wen Kroy Realty Co., Inc. v. The Public Nat'l Bank and Trust Co. of New York*, 260 N.Y.84, 90 (N.Y. 1932)(stating that although a corporate principal gave its president unrestricted authority to manage its business, which included the authority to transfer and indorse negotiable

15

instruments payable to the order of the corporation, does not infer that the principal intended the president to have authority to transfer and indorse its negotiable instruments when not managing the corporation's business and when despoiling it of its property).

An '"attorney-in-fact must act in the utmost good faith and undivided loyalty toward the principal, and must act in accordance with the highest principles of morality, fidelity, loyalty and fair dealing."' *In the matter of George J. Ferrera*, 7 N.Y.3d 244, 254 (N.Y. 2006)(citing *Semmler v. Naples,* 166 A.D.2d 751, 752 (N.Y. App. Div. 1990)). 'When a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make "full disclosure" of all material facts. . . . Absent such full disclosure, the transaction is voidable.' *Blue Chip Emerald LLC v. Allied Partners Inc.*, 299 A.D.2d 278, 279-80 (N.Y. App. Div. 2002) (internal citations omitted). "Consistent with this duty, an agent may not make a gift to himself or a third party of the money or property which is the subject of the agency relationship." *Semmler v. Naples*, 166 A.D.2d at 752. See *Mantella v. Mantella*, 268 A.D.2d 852, 852, 701 N.Y.S.2d 715 (N.Y. App. Div. 2000). Such a gift carries a presumption of impropriety and self-dealing which can be overcome only with the clearest showing of intent on the part of the principal to make the gift. *Semmler v. Naples*, 166 A.D.2d at 752; *Mantella*, 268 A.D.2d at 852-53. When the agent "abandons the principal's interests and acts entirely for his or another's purposes" then the general rule of vicarious liability on the part of the principal does not apply. *Bedessee Imports, Inc. v. Cook, Hall & Hyde, Inc.*, 45 A.D.3d 792, 795, 847 N.Y.S.2d 151 (N.Y. App. Div. 2007); *Chubb & Son Inc.,* 283 A.D.2d at 299.

In this case, there is no evidence that Sarter had given the Debtor or an employee of

16

Metropolitan unfettered discretion to conduct a closing on Plaintiff's property without Sarter's knowledge, a discussion of the basic details of the sale transaction, and authorization to go forward with the closing.  The Debtor would have needed to inform the Plaintiff about a potential sale of property and the details of the sale in order to determine the Plaintiff's cost-basis in the property, the interest due to the Plaintiff, and Plaintiff's share of profits.  More importantly, Plaintiff required Metropolitan to forward a closing statement soon after each sale so that it could inform Medallion that an asset sale occurred.  It is only after such notice or discussion would Metropolitan obtain authority to sign the closing documents on behalf of the Plaintiff.

As shown by the April 2007 Agreement, the Plaintiff had knowledge of, and was compensated for, the sale of its properties to 3rd parties or to the Debtor except for the sale of the Brookhaven Avenue Property, the Coursen Place Property and 7 other parcels of property listed in an exhibit to the April 2007 Agreement.  The Debtor does not dispute the accuracy of this attachment.  The Debtor asserts that the Plaintiff did not object when the Debtor previously executed Sarter's name on the deeds and contracts of sale in order to transfer property in North Greenbush and in Staten Island from the Plaintiff to himself.  Those sales, however, are distinguishable from the transfers of the Properties at issue.  Although the Plaintiff may not have looked too closely at the identity of the purchaser of the North Greenbush and Staten Island properties, the Plaintiff knew those properties were being sold or had requested the Debtor to sell the properties and Plaintiff was compensated for the sale.  Here, the Debtor did not disclose his intent to transfer the Brookhaven Avenue Property and the Coursen Place Property to himself and incur liens against the Properties.  He did not obtain Sarter's consent because the Debtor did

not intend to compensate the Plaintiff from the loan proceeds.  When the Debtor engaged in the

transfer of the Properties, the Debtor was not acting for the benefit of the Plaintiff but for himself

and Metropolitan.  The Debtor cannot wrongfully transfer the Properties for his own benefit or

the benefit of a third party by cloaking these transfers with actual authorization the Plaintiff gave

him with respect to the transfer of other properties.  Therefore, in the matter before the Court,

Debtor did not have actual authority to transfer the Brookhaven Avenue Property and Coursen

Place Property to himself.

Whether  the Plaintiff may still be liable with respect to third parties depends upon

whether the mortgagees believed the Debtor had apparent authority to convey the Properties.

> Apparent authority is based on the principle of estoppel.  It arises when a
> principal places an agent in a position where it appears that the agent has certain
> powers which he may or may not possess.  If a third person holds the reasonable
> belief that the agent was acting within the scope of his authority and changes his
> position in reliance on the agent's act, the principal is estopped to deny that the
> agent's act was not authorized.

*Masuda,* 328 F.2d at 665.  There must be words or conduct of the principal communicated to a

third party that gave rise to the appearance and belief that the agent possesses the authority to

enter into a transaction, and the third party relied upon the agent's misrepresentation because of

some misleading conduct on the part of the principal.  *Merrell-Benco Agency, LLC v. HSBC*

*Bank USA*, 20 A.D.3d 605, 608, 799 N.Y.S.2d 590 (N.Y. App. Div. 2005).  See also, *Wen Kroy*

*Realty Co.*, 260 N.Y. at 91-92; *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 551 (N.Y.

1997).

In *Minskoff v. American Express Travel Related Services Co., Inc.*, 98 F.3d 703, the

plaintiff sought a recovery of payments made on charges on corporate credit cards that were

18

fraudulently obtained by the president's assistant.  The Second Circuit found that while the president was not accountable for the assistant's initial possession of the fraudulent obtained credit cards, the president was liable for the purchases the assistant made with the fraudulently obtained cards because the president received the billing statements but neglected to exercise reasonable care and promptness in examining the credit card statements to discover any unauthorized signatures or charges.  Under the New York Uniform Commercial Code, consumers are obligated to examine statements to discover any unauthorized activity.  The Court found  the president gave the assistant authority to forward the credit card statements to the bookkeepers for payment without first examining the statements and the president was in a better situation to discover any forgery of his signature than the credit card companies.

In the case before the Court, there does not appear to be apparent authority for the Debtor to convey the Properties in question to himself.  The Plaintiff did not do anything to give Lend America the impression that the Debtor was its agent with respect to the transfers at issue as Sarter did not have any interaction with Lend America.  There is no evidence that Plaintiff had a prior relationship with Lend America.  There was no reason for Lend America to bebelieve that Plaintiff had authorized the Debtor's actions in connection with the Properties.  The Plaintiff was not present at the closings for the Properties and did not learn about the transfers until after the closings occurred and the monies from the mortgagees already had been advanced to the Debtor. The Plaintiff would not have received any information from a third party or the mortgagees indicating that the Debtor mortgaged the Properties without compensating the Plaintiff.  The $294,000 check to the Plaintiff issued by the mortgage disbursement agent allegedly from the proceeds of the sale of the Brookhaven Avenue Property was used to pay the Plaintiff with

respect to the sale of a different parcel of property that took place around the same time.  The

Debtor deliberately withheld information about the transfers, the closing statements for the sale

of these Properties, and the proceeds of sale from the Plaintiff.

Although the Defendants argue that the Debtor had apparent authority to sign on behalf

of the Plaintiff in light of the hundreds of closing transactions the Debtor took part in over the

years, the Debtor never had any authority to sign Sarter's name with respect to the Properties in

question.  There is no evidence that the mortgagees ever undertook to determine the extent of the

Debtor's authority to sign Sarter's name on behalf of Treuhold for any of the sales transaction

that occurred.  Lend America only verified the Debtor's eligibility to obtain a loan and relied

upon the deeds as presented by the Debtor which falsely represented that he was the fee owner of

the Properties.  Lend America did not question whether Debtor had the authority to sign Sarter's

name on the deeds to the Properties on behalf of the seller, especially when the Debtor was also

the purchaser of the Properties.  Similarly Wells Fargo and Saxon did not rely upon any action

by the Plaintiff in their decision to extend the Debtor the financing for the purchase of the

Properties but rather they each relied upon the validity of the loan transaction between the

Debtor and Lend America in their decision to take assignment of the notes and mortgages

obtained by Lend America.  Unfortunately, the deeds were forgeries and the mortgagees never

requested any assurance from the Plaintiff that the Debtor could act as an authorized signatory of

the Plaintiff or sign Sarter's name on the closing documents.  Accordingly, the mortgagees

assumed that those transfers were similar to authorized transfers in the past and assumed a risk

that the documentation presented to them might be invalid.  Their decision to take such a risk

was not based upon any conduct or omission by the Plaintiff.  There is no evidence that the

20

Plaintiff engaged in any conduct to mislead the mortgagees that the Debtor was authorized to transfer the Properties to himself nor did the Plaintiff do anything to change the position of the mortgagees to their detriment in determining whether to extend financing to the Debtor. Accordingly, the mortgagees did not rely on any action by the Plaintiff in their decision to extend financing to the Debtor but rather upon the Debtor's misrepresentations that he had authority to sign the deeds and such reliance cannot constitute apparent authority on behalf of the Plaintiff.

As the Debtor did not have any actual or apparent authorization to sign Sarter's name on the deeds to the Properties, the signature on the deeds constitutes a forgery. "Forgery . . . is the false making or material alteration or addition to a written instrument for the purpose of deceit and fraud" and a test of forgery is whether a person has falsely made a writing which purports to be any act of another with the purpose to defraud. *International Union Bank v. National Surety Co.*, 245 N.Y. 368, 373 (N.Y. 1927).

"A forged deed is void and conveys no title." *Yin Wu v. Wu*, 288 A.D.2d 104, 105 (N.Y. App. Div. 2001). Because a forger has no title to convey, "a person cannot be a bona fide purchaser through a forged deed." *Id.*, citing *Field v. Field*, 130 Misc.2d 751,754 (N.Y. Sup. Ct. 1985). While New York Real Property Law § 266 provides that title of a purchaser or encumbrancer for a valuable consideration is not impaired unless he had previous notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor, this provision "applies to fraud situations that are voidable, not those which are void." *Yin Wu*, 288 A.D.2d at 105. Where the deed based on forgery is void *ab initio*, the mortgage based upon such a deed is likewise invalid. *GMAC Mortgage Corp. v. Chan*, 56 A.D.3d 521, 522 (N.Y.

21

App. Div. 2008); *Cruz v. Cruz*, 37 A.D.3d 754 (N.Y. App. Div. 2007); *Karan v. Hoskins*, 22

A.D.3d 638, 639 (N.Y. App. Div. 2005).  Because the Debtor signed Sarter's name on the deeds

to the Properties without any authorization or notice given to Sarter in order to falsely convey

the Properties from the Plaintiff to the Debtor for no consideration and to convince the

mortgagees to extend him a loan, the deeds to the Properties are invalid.  Because an assignee of

a mortgage acquires no rights greater than those of the assignor, *Crispino v. Greenpoint*

*Mortgage Corp.*, 304 A.D.2d 608, 609 (N.Y. App. Div. 2003), the assignments of the mortgages

held by Wells Fargo and Saxon are also invalid.


3.      Was there a novation under the April 2007 Agreement?

        The parties next dispute whether the April 2007 Agreement constitutes an executory

accord or a novation.  If the April 2007 Agreement is a novation then the Plaintiff would be

barred from setting aside the Debtor's conveyance of the Properties and the mortgage liens

would remain on the Properties.

        In order to have a novation, there must be: (1) a previously valid obligation; (2) an

agreement of all parties to the extinguishment of the old contract; (3) an agreement of the parties

to a new contract; and (4) a valid new contract.  'A novation is "an agreement for an existing

obligation to be extinguished immediately by the acceptance of a new promise."' *Sudul v.*

*Computer Outsourcing Serv., Inc.*, 917 F. Supp. 1033, 1047-48 (S.D.N.Y. 1996) citing *May*

*Dep't Stores Co. v. International Leasing Corp., Inc.*, 1 F.3d 138, 140 (2d Cir. 1993).  "[W]here

the parties have clearly expressed or manifested their intention that a subsequent agreement

supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one

22

and the remedy for breach thereof is to sue on the superseding agreement." *Northville Indus. Corp. v. FT Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867, 474 N.Y.S.2d 122 (N.Y. App. Div. 1984) citing *American Broadcasting-Paramount Theatres, Inc. v. American Mfrs. Mutual Ins. Co.*, 48 Misc.2d 397, 403 (N.Y. Sup. Ct. 1965).  However, where the original contract has already been breached there cannot be a novation as a previously valid obligation did not exist at the time the new contract was made.  *Wasserstrom v. Interstate Litho. Corp.*, 114 A.D.2d 952, 954 (N.Y. App. Div. 1985).

In contrast, an executory accord as defined under N.Y. General Obligations Law § 15-501 means an agreement embodying a promise to accept at some future time a stipulated performance in satisfaction or discharge in whole or in part of any present claim, cause of action, contract, or obligation, or lease, and a promise to render such performance.  If an executory accord is not performed according to its terms by one party, the other party is entitled either to assert his rights under the claim, cause of action, contract, or obligation which is the subject of the accord, or to assert his right under the accord.  N.Y. Gen. Oblig. Law § 15-501.

An accord is "an agreement that a stipulated performance will be accepted, in the future, in lieu of an existing claim.  Execution of the agreement is satisfaction.  The distinctive feature of an accord and satisfaction is that the obligee does not intend to discharge the existing claim merely upon the making of the accord; what is bargained for is the performance, or satisfaction." *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (N.Y. 1993)(internal citations omitted).  Generally, it is assumed that one does not surrender an existing obligation for a promise to perform in the future and that it is more reasonable to suppose that the obligee is required to surrender his old rights only when the accord has been performed.  *Goldbard v.*

*Empire State Mutual Life Ins. Co.*, 5 A.D.2d 230, 236 (N.Y. App. Div. 1958).  Even if an

agreement contains language that it supersedes any and all prior agreements, there is no novation

or satisfaction of an accord if the agreement contemplates future performance before any prior

claims of the obligee are extinguished.  *In re Worldcom, Inc.*, 382 B.R. 610, 623-24 (S.D.N.Y.

2008).  If the executory accord is not performed, then there is no satisfaction and the obligee has

the option of either enforcing the accord or suing on the original claim.  *Id.*, 382 at 624;

*Denburg*, 82 N.Y.2d at 383; *Albee Truck Inc. v. Halpin Fire Equip Inc.*, 206 A.D.2d 789, 790-91

(N.Y. App. Div. 1994).

There is no evidence that the April 2007 Agreement constituted a novation barring any

right of the Plaintiff to sue the Debtor based upon the Plaintiff's original claim that the Debtor's

transfer of the Properties to himself using a forged deed is void.  The Debtor had breached the

January 2007 Agreement by failing to make the final payment.  Therefore, when the Plaintiff and

the Debtor entered into the April 2007 Agreement there was no previously valid agreement in

existence at the time.  Despite language in the April 2007 Agreement that the parties intended

such agreement to supersede any prior agreements, the April 2007 agreement does not constitute

a novation as there was no satisfaction of the Debtor's and Wissak's payment obligations.  The

April 2007 Agreement contemplates joint and several liability on the part of the Debtor and

Wissak and by its own terms requires performance by either or both of them in exchange for a

release of liability.  Should the Debtor and/or Wissak default, the Plaintiff's agreement to forbear

from taking any action would terminate and the Plaintiff would be free to foreclose the Wissak

Mortgage, release the Wissak Deed from escrow and record the deed, or commence any and all

litigation it deemed appropriate against each of the Obligors and others, which would also

24

include suing on the original claim.  Moreover, there is no evidence that the April 2007

Agreement has been satisfied by Wissak either through the mortgage or the state court judgment

and that a recovery against the Debtor under the April 2007 Agreement should be barred.

Accordingly, the April 2007 Agreement constituted an executory accord under N.Y. Gen.  Oblig.

Law § 15-501 and not a novation and the Plaintiff is entitled to prosecute its claim to set aside

the transfer of the Properties free and clear of liens.


4.      Defendants' Affirmative Defenses.

        The Defendants argue that the Plaintiff ratified the Debtor's transfer of the Properties

when the Plaintiff did not initially seek to set aside the transfer but rather sought compensation

under the April 2007 Agreement.  In order to have a ratification, there must be acceptance by the

principal of the benefits of the agent's acts with full and complete knowledge of the facts and

circumstances, or an affirmative election indicating an intention to adopt the unauthorized

arrangement.  An intent to ratify can be "implied from knowledge of the principal coupled with

failure to timely repudiate, where the party seeking a finding of ratification has in some way

relied upon the principal's silence or where the effect of the contract depends upon future

events."  *The Monarch Ins. Co. of Ohio v. The Insurance Corp. of Ireland Ltd.*, 835 F.2d 32, 36

(2d Cir. 1987).  With respect to the Debtor, there can be no ratification as the Plaintiff did not

agree to release the Debtor from any liability until the April 2007 Agreement had been satisfied.

Unless the Debtor and/or Wissak repaid the Plaintiff in full for the transfer of the Properties, the

Plaintiff did not receive the benefit of the Debtor's wrongful transfer.  As discussed above, the

April 2007 Agreement did not limit the Plaintiff's legal remedies only to monetary compensation

should the Obligors default.  Therefore, the Plaintiff did not affirmatively elect to forego any remedy against the Properties.

Similarly with the election of remedies, the Debtor was jointly and severally liable with Wissak under the April 2007 Agreement.  Because the Plaintiff chose to sue Wissak on other grounds does not mean that it is foreclosed from suing the Debtor under a different remedy.  In addition, res judicata does not apply in this situation as the Debtor was never a party to the Wissak Action.

The mortgagees allege that the Plaintiff's delay in publicly or legally challenging the mortgages gave rise to the appearance and belief that the transfers of the Properties were authorized by the Plaintiff.  For there to be a ratification, there must be evidence to show that 1) the Plaintiff knew the Debtor transferred the Properties to himself without authorization, 2) the Plaintiff failed to challenge the unauthorized transfers in a timely fashion, and 3) the mortgagees relied upon the Plaintiff purported acceptance and silence with respect to the unauthorized transfers to the mortgagees' detriment.  Here, the Plaintiff discovered the authorized transfers in December of 2006 and immediately confronted the Debtor and Wissak about the transfers and demanded the Debtor and Wissak to compensate the Plaintiff for the transfers.  When the Debtor was unable to satisfy his obligations under the April 2007 Agreement and filed for bankruptcy relief in January of 2008, the Plaintiff commenced this adversary proceeding exactly two months after the bankruptcy filing seeking to set aside the transfers of the Properties.  Therefore, the Plaintiff has not remained passive in the matter.  Moreover, the mortgagees failed to show that they relied upon the Plaintiff's alleged silence in the matter to their detriment.  While the mortgagees claimed ignorance of the unauthorized nature of the transfers of the Properties and

26

perhaps of the Plaintiff's attempts to recover the benefit of the transfers under the January 2007

Agreement or the April 2007 Agreement, the mortgagees' decision to extend the Debtor the

necessary financing for the Properties was not dependent upon the Plaintiff's entry into these

agreements with the Debtor and Wissak as the mortgagees had disbursed the funds to the Debtor

back in November of 2006 which was before the Plaintiff even learned about the unauthorized

transfers.  In addition, the mortgagees' behavior or position did not change after the April 2007

Agreement was entered.  Accordingly, there is no evidence that the mortgagees relied upon the

Plaintiff's silence after the execution of the April 2007 Agreement to their detriment given their

lack of knowledge of the Debtor's forged deed and the April 2007 Agreement.

 The Plaintiff commenced this adversary proceeding soon after the Debtor defaulted and

within a year and a half after the alleged transfers.  The delay in challenging the transfer of the

Properties was not unreasonable.  Accordingly, there is no evidence supporting the argument that

the Plaintiff ratified the Debtor's transfer of the Properties to himself for no consideration.

Likewise, the Defendants' arguments of waiver by the Plaintiff must fail.  Waiver

requires proof of a voluntary and intentional relinquishment of a known or otherwise enforceable

right and cannot be inferred from mere silence.  *Haberman v. Haberman*, 216 A.D.2d 525, 527,

629 N.Y.S.2d 65 (N.Y. App. Div. 1995).  See also *Commerce Funding Corp. v. Comprehensive*

*Habilitation Serv., Inc.*, No. 01 Civ 3796, 2005 WL 447377, *15 (S.D.N.Y. Feb. 24, 2005).

There was no relinquishment of the Plaintiff's right to bring an action to set aside the forged

deeds as the Debtor and Wissak never fully performed their obligations under the April 2007

Agreement and the Plaintiff expressly reserved its right to pursue any of its rights and remedies,

which includes the right to proceed under the original claim as set forth under N.Y. Gen. Oblig.

27

Law § 15-501.

The Defendants raise the argument of laches. Laches requires a showing of undue delay by a party in asserting its rights and prejudice to the opposing party as a result of such delay. *Moreschi v. DiPasquale*, 58 A.D.3d 545 (N.Y. App. Div. 2009). The party asserting a defense of laches must show: (1) conduct by an offending party giving rise to the situation complained of; (2) delay by the complainant in asserting his claim for relief despite an opportunity to do so; (3) lack of knowledge or notice on the part of the offending party that the complainant would assert his claim for relief; and (4) injury or prejudice to the offending party in the event that the relief is granted to the complainant. *Cohen v. Krantz*, 227 A.D.2d 581, 582 (N.Y. App. Div. 1996). "Mere inaction or delay in bringing a proceeding without showing of prejudice does not constitute laches . . . . [T]here must be a showing not only of a delay but also an injury, change of position or other disadvantage resulting from such delay." *Haberman*, 216 A.D.2d at 527. As discussed above, the Defendants have not shown how the delay, if any, by the Plaintiff in challenging the mortgagees' liens on the Properties resulted in an injury, change of position or other disadvantage with respect to the Defendants' liens. Even if the Plaintiff had taken more care to examine the closing documents for prior transactions and would have noticed that the Debtor signed Sarter's name on prior occasions, the Debtor was authorized to sign on behalf of the Plaintiff for those transactions. At most, those transactions would have conveyed the Debtor's carelessness or sloppiness with the transaction documents. Plaintiff would have no evidence that the Debtor was conveying other properties to himself without authorization as the Debtor did not forward the sale documents at issue to the Plaintiff. The earliest opportunity that the Plaintiff could have challenged the mortgage liens was approximately when it discovered the

28

Debtor's misconduct and discussed the unauthorized transfers with the Debtor and Wissak in December of 2006/January of 2007.  The mortgages were provided to the Debtor in November 2006, prior to Plaintiff's discovery of the Debtor's fraud.  Even if the Plaintiff had commenced legal action against the Debtor and the mortgagees at that time, the result would have been the same – the mortgagees' liens are void *ab initio* because the deeds transferring the Properties to the Debtor were forged.  The Defendants did not suffer any injury or prejudice as a result of the Plaintiff commencing this adversary proceeding one and a half years after the transfers of the Properties occurred.  Accordingly, the defense of laches must fail.

In order to establish equitable estoppel, the Defendants must prove that they 'reasonably or "rightfully" relied on plaintiff's word or deed and, by reason of such reliance, changed its position to its detriment.' *Fine Cut Diamonds Corp. v. Shetrit*, Slip Op. 1283/06, 2009 WL 264122, *4 (N.Y. Sup. Ct.  Feb. 3, 2009).  With respect to the Debtor, the Plaintiff was entitled to pursue all of its remedies, not just for breach of the April 2007 Agreement, as discussed above.  Accordingly, there was no word or conduct by the Plaintiff limiting itself to suing for breach of contract should there be a default.  With respect to the mortgagees, the Defendants have failed to show any evidence that the mortgagees relied upon any word or deed by the Plaintiff that changed their position to their detriment.  As discussed above, the validity of the prior 100 transfers of properties whereby the Plaintiff gave the Debtor and/or Metropolitan authorization to sign closing documents and deeds on its behalf as an agent for the Plaintiff does not cloak the transfers where the Debtor conveyed the Properties to himself by forged deeds, without notice to the Plaintiff, with validity.  There was no change in position by the mortgagees in its decision to lend monies to the Debtor (not to the Plaintiff) arising from the past history of

valid transfers nor from the April 2007 Agreement.  Accordingly, the argument of equitable estoppel must also fail.

The Defendants' defense of unclean hands by the Plaintiff requires the Defendants to prove that (1) the Plaintiff is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by the Defendants; and (3) the Defendants were injured as a result.  *Id.*, 2009 WL 264122, *5.  The Defendants have not presented any evidence of immoral or unconscionable conduct on the part of the Plaintiff.  While the Plaintiff may have been lax in its oversight of its properties, there is no evidence that such conduct rose to the level of being immoral or unconscionable.  Nor was there any evidence that the Plaintiff had prior knowledge of the Debtor's forgery with respect to other properties but continued to allow the Debtor the same opportunity to forge the deeds to the two Properties in question thereby resulting in prejudice to the mortgagees.  Rather, the injury to the mortgagees came from the Debtor's forgery and transfer of the Properties without authorization and compensation to the Plaintiff.  Accordingly, the Defendants have failed to demonstrate the elements of the defense of unclean hands of the Plaintiff to them.  Rather, any injury suffered by the mortgagees were a result of the Debtor's actions and not a result of any action by the Plaintiff.

Lastly, the Defendants argue on equitable grounds that the transfer of the Properties back to the Plaintiff free and clear of any liens would overcompensate the Plaintiff for its claim under the April 2007 Agreement.  Of the $3,104,086 owed, the Plaintiff has recovered $1,976,175 and a judgment in the amount of $761,552 against Wissak, and continues to hold the Wissak Mortgage in the amount of $857,000 and the Wissak Deed.  Accordingly, the Defendants argue that Plaintiff's claim against the Defendants should be limited to the payment of the debt owed

under the April 2007 Agreement and the Plaintiff should be barred from setting aside the transfer of the Properties and the mortgage liens.

It is uncertain whether the value of the Properties in question would even satisfy the Plaintiff's proof of claim.  The Plaintiff filed a proof of claim in the unsecured amount of $1,324,643.82 seeking a recovery with respect to the nine unauthorized transfers of property of which two transfers are the subject of this adversary proceeding and $150,000 in attorney's fees under the April 2007 Agreement.  Schedule A of the Debtor's bankruptcy petition lists the Brookhaven Avenue Property as having a value of $470,000 and the Coursen Place Property as having a value of $450,000.  The combined value of the Properties on the petition date is less than the amount of the Plaintiff's proof of claim.  Moreover, whether the Plaintiff has recourse against the Wissak Mortgage and Wissak Deed is irrelevant with respect to the Debtor so long as the Obligors' indebtedness to the Plaintiff remains unsatisfied.  Because the obligation under the April 2007 Agreement is joint and several, Plaintiff is entitled to proceed against the Debtor as well as Wissak.  As the deeds were forged, the Plaintiff would be entitled to set aside the deeds free and clear even though the mortgagees may be innocent victims of the Debtor's deceit. Although the mortgagees' liens would be set aside, the mortgagees would be entitled to unsecured claims against the Debtor's bankruptcy estate for the monies advanced to the Debtor under the loans as a result of Debtor's fraudulent actions.


<u>CONCLUSION</u>

Based upon the foregoing, 1) the Plaintiff and Metropolitan were not engaged in a joint venture; 2) the Debtor did not have actual authority or apparent authority to sign Sarter's name

to the deeds to the subject Properties; 3) the Debtor's signing of Sarter's name on the deeds to the Properties constituted a forgery; 4) the forged deeds are void *ab initio* along with the mortgage liens against the Properties; 5) the affirmative defenses asserted by the Defendants are denied; and 6) the Properties are not property of the Debtor's bankruptcy estate under 11 U.S.C. § 541. Accordingly, the Plaintiff is entitled to the recovery of the Properties free and clear of all existing liens. The secured claims of Wells Fargo and Saxon with respect to their mortgage liens against the Properties should be reclassified as unsecured claims against the Debtor's bankruptcy estate.

Accordingly, the Plaintiff's motion for summary judgment is granted and the Defendants' joint motion for summary judgment is denied.

So ordered.

Dated: Central Islip, New York
June 29, 2009

        *s/Dorothy Eisenberg*
        Dorothy Eisenberg
        United States Bankruptcy Judge